FILED
2013 Jul-02  PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION

| | | |
|---|---|---|
| LORETTA DENISE MONROE, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 7:11-cv-03412- |
| | ) | KOB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On December 2, 2008, the claimant, Loretta Denise Monroe, applied for supplemental security income under Title II of the Social Security Act. She alleges disability commencing on August 26, 2008, because of lymphedema, depression, cancer and related surgeries. The Commissioner denied the claim initially and affirmed his denial on reconsideration. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 15, 2010. (R. 17). In a decision dated May 21, 2010, the ALJ found that the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. (R. 28). On July 22, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-6). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

1

## II. ISSUES PRESENTED

The following issues are before the court: (1) whether the ALJ had substantial evidence to support his conclusion that the claimant did not meet the requirements of 12.05(C) Mental Retardation because the claimant was not mentally retarded, but borderline intellectually functioning; and (2) whether the ALJ applied the appropriate legal standard when he evaluated the treating physician's opinion.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

engage in any substantial gainful activity by reason of any medically determinable

2

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The claimant has the burden of proving that an impairment meets or equals a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). If the claimant contends that an impairment equals a listed impairment, the claimant must present evidence describing how the impairment has such an equivalency. *Wilkinson on behalf of Wilkinson v. Bowen*, 847 F.2d 660, 662 (1987).

The Eleventh Circuit has determined that for a claimant to be disabled under 12.05,

> [A] claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22. Generally, the claimant meets the criteria for presumptive disability under section . . . 12.05(C) when the claimant presents a valid IQ score of 60 through 70 inclusive, and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.

*Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir.1997); *see also Lowery v. Sullivan*, 979

F.2d 835, 837 (11th Cir. 1992) (finding that a valid IQ score need not be conclusive of mental retardation when the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior). To establish a disability under section 12.05(C), a claimant must establish "a valid verbal, performance, or full scale, IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993).

The Eleventh Circuit, however, also has determined that an ALJ is not required to base a finding of mental retardation on the results of an IQ test alone when he evaluates whether a claimant meets the requirements of 12.05(C). *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *see also Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) (finding that no case law "requir[es] the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation"). An ALJ is required to base his determination of mental retardation on the combination of intelligence tests and the medical report. ALJs evaluate intelligence tests "to assure consistency with daily activities and behavior." *Popp*, 779 F.2d at 1499. If intelligence tests are inconsistent with the medical record and/or the claimant's daily activities and behavior, good reason exists to believe that the intelligence tests should be discredited. *Popp*, 779 F.2d at 1500. When the evidence conflicts, "it is the ALJ's responsibility, not the Court's, 'to reconcile inconsistencies in the medical evidence.'" *White v. Astrue*, 2012 U.S. Dist. Lexis 44494, *14 (W.D.N.C. 2012) (quoting *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976)).

When an ALJ evaluates conflicting evidence, he may reject any medical opinion if the evidence supports a contrary finding. *Syrock v. Kechler*, 764 F.2d 834, 835 (11th Cir. 1985). For

example, the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Comm'r Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004). In other words, an ALJ cannot "arbitrarily substitute his own hunch or intuition for the diagnoses of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring). However, an ALJ has no legal obligation to defer to a treating physician's report if the treating physician is unsure of the accuracy of his findings and statements. *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991). Additionally, an ALJ need not adhere to the findings of the treating physician if "the (1) treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

## V. FACTS

The claimant was forty-two years old at the time of her hearing. She has a high school graduation certificate that she earned in special education classes. (R. 237-38). Her prior work experience includes working as a turner and former in a glove factory, a commercial cleaner, and an institutional attendant. (R. 26). On appeal, the claimant first contends that she is disabled because she meets the Listing 12.05(C) Mental Retardation. Secondly, the claimant contends that the ALJ committed a reversible error when he determined that the claimant was Borderline Intellectual Functioning. Thirdly, the claimant argues that the ALJ did not give sufficient weight to her treating physician's testimony that the claimant could not work more than two hours a day. Pl.'s Br. 5, 15.

*Mental Limitations*

The claimant received a high school graduation certificate on May 29, 1986. The claimant's records indicate that she completed high school in all special education classes.  (R. 237-238).

 On February 17, 2009, Dr. Michael P. Griffin performed a Consultative Examination Report-Mental Consultative Evaluation with IQ testing at the request of the Disability Determination Service. Dr. Griffin noted that the claimant denied significant difficulty handling money; denied a long history of treatment for psychiatric symptoms; indicated the only psychiatric treatment she had ever received was an antidepressant that she began taking in December of 2008 after being diagnosed with breast cancer; indicated that the claimant reported she had been generally depressed, anxious, and easily irritable since she was diagnosed with cancer in October 2008; and that she believed her depression would alleviate if her cancer was successfully treated. Dr. Griffin stated that the claimant did not endorse a history of significant difficulties with adaptive functioning skills that would imply mental retardation and that the claimant indicated that, since her cancer diagnosis, the claimant preferred to spend time alone. Dr. Griffin, however, also concluded that the claimant is able to interact with other people without significant impairments. (R. 372-73).

Dr. Griffin found that the claimant was open, cooperative, reliable, relatively alert, and attentive, but that the claimant's concentration was impaired. Dr. Griffin stated that the claimant did not have noticeable impairments in her gross motor functioning and was oriented to person, place, time, and situation. Based on the claimant's ability or inability to remember a list of words after varying lengths of time, Dr. Griffin concluded that the claimant's immediate memory was

6

intact, but the claimant's recent memory was impaired. Dr. Griffin stated that the claimant demonstrated abstract reasoning and that the claimant's thought processes were logical and organized. Dr. Griffin also noted that the claimant reported being sad and appeared "with consistent affect" and stated she had been happy "a few times," sad "almost all the time," and irritable "when she hear[d] loud noises" over the last month. *Id*.

During his evaluation, Dr. Griffin administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). Dr. Griffin noted that he administered the WAIS-IV under optimal testing conditions, even though the claimant's concentration appeared to be significantly impaired. Dr. Griffin stated that the claimant appeared to have difficulty attending to the items, was easily distracted, and often seemed to forget the instructions. Based on these observations, Dr. Griffin concluded that the claimant's scores were "likely an underestimate of her intellectual functioning." (R. 373). Dr. Griffin reported that the claimant scored a Verbal Comprehension Index (VCI) score of 66, a Perceptual Reasoning Index (PRI) score of 63, a Working Memory Index (WMI) score of 69, a Processing Speed Index (PSI) of 74, a Full Scale IQ (FSIQ) of 62, and a Global Assessment of Functioning (GAF) of 60. Dr. Griffin concluded that the three point difference between the claimant's VCI and PRI was not significant; that the claimant's FSIQ was the most appropriate measure of the claimant's overall intellectual functioning; and that the FSIQ indicated that the claimant's intellectual abilities probably fell in the Mild Mental Retardation range of intellectual functioning. (R. 373-74).

Dr. Griffin also determined that the claimant suffered from an Adjustment Disorder with Depressed Mood that was partially controlled with psychotropic medications. Dr. Griffin noted that no records suggested previous tests of the claimant's intellectual functioning below a score of

70 and no reported deficiencies in the claimant's level of adaptive functioning. Thus, Dr. Griffin determined that it would be premature to diagnose the claimant with Mild Mental Retardation because he did not have access to sufficient evidence of the claimant's educational and social history. Dr. Griffin concluded that the claimant's intellectual deficits are a chronic condition and that the claimant is unlikely to improve significantly in the future. (R. 374-75).

Dr. Griffin stated that the claimant's depression appeared to be the direct result of her recent diagnosis with breast cancer and that the claimant's depression would likely resolve once her cancer was in remission or successfully treated. Dr. Griffin suggested that the claimant would benefit from a modified medication regimen that would focus on minimizing the claimant's depression and that the claimant's concentration might show marked improvement once the claimant's affective symptoms were controlled. (R. 375).

Based on these results and his determination that the results under-represented the claimant's true abilities, Dr. Griffin determined that the claimant "should be able to perform unskilled labor, especially if she is provided appropriate training, time to learn the tasks, as well as adequate support and supervision" but might not be capable of performing tasks that require higher-level cognitive functioning, detailed planning, or organization. (R. 373-75).

On March 13, 2009, Dr. Gloria Roque performed a Psychiatric Review Technique of the claimant's 12.02 Organic Mental Disorders and 12.04 Affective Disorders.[1] Dr. Roque stated that the claimant had Mild Mental Retardation IQ scores that underestimated the claimant's ability and that the claimant had adjustment disorder with depressed mood. (R. 378-81). In evaluating the claimant's functional limitations, Dr. Roque indicated that the claimant's daily living activities

---

[1] The record does not indicate who requested the Psychiatric Review Technique.

were mildly restricted; the claimant had moderate difficulties in maintaining social functioning; the claimant had moderate difficulties in maintaining concentration, persistence, or pace; and that the claimant had no episodes of decompensation. (R. 388). Dr. Roque noted that the claimant was taking Lexapro daily, as prescribed by her cancer doctors. Dr. Roque indicated that the claimant stated she could just be sitting and watching TV and start crying and that thoughts about her cancer and related surgeries triggered the claimant's depression and crying. Dr. Roque noted that the claimant believed the medication was helping a little, but that the claimant still felt depressed. (R. 390).

Dr. Roque also performed a Mental Residual Functional Capacity Assessment on March 13, 2009.[2] In this evaluation, Dr. Roque noted that the claimant's ability to remember locations and work-like procedures was moderately limited; the claimant's ability to understand and remember detailed instructions was moderately limited; the claimant's ability to carry out detailed instructions, maintain attention and concentration for extended periods, and sustain an ordinary routine without specialized supervision were moderately limited; the claimant's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited; the claimant's abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors were moderately limited; and the claimant's ability to respond appropriately to changes in the work setting was moderately limited. Dr. Roque concluded that the claimant would learn and remember simple

---

[2]The record does not indicate who requested the Mental Residual Functional Capacity Assessment.

work routines with practice; could understand and remember simple instructions, but not detailed ones; could carry out simple instructions; sustain attention to simple, familiar tasks for extended periods; but would benefit from casual supervision and should avoid rapid changes and multiple demands. Dr. Roque indicated that the claimant would function best with a simple, repetitive work routine; that the claimant's contact with co-workers and the general public should be casual; and that feedback given to the claimant should be simple, clear, and supportive.  Dr. Roque ultimately concluded that the claimant could adapt to infrequent, well-explained changes. (R. 392-94).

*Physical Limitations*

On December 10, 1998, the claimant went to Dr. Jerry Henson for a yearly check-up. Dr. Henson indicated that the claimant had leukorrhea that was "whitish with foul odor" and diagnosed the claimant with bacterial vaginosis and prescribed Flagyl. (R. 286-87).

On April 25, 2000, Dr. Henson treated the claimant for pelvic pain and ordered an ultrasound on the claimant's pelvic region. Dr. Henson reported that the ultrasonographer indicated that the claimant had some fluid in her pelvis and, therefore, probably had a ruptured cyst. Dr. Henson noted that the claimant took a pregnancy test, which was negative, at an emergency room the night before when she sought treatment for pain in her lower abdomen, but the record does not contain any evidence of this emergency room visit. Dr. Henson reported that the claimant's abdomen revealed some diffuse tenderness in the bilateral lower quadrants, particularly in the right lower quadrant area and that he did not feel any significant masses. Dr. Henson prescribed Lortab; noted that the claimant already had a prescription for Darvocet; wrote

10

a work excuse through Thursday of that week; and indicated that the claimant should return to work on Friday if possible. (R. 284).

On May 17, 2000, Dr. Henson treated the claimant for soreness in the right lower quadrant of her abdomen. Dr. Henson indicated that the claimant's right lower quadrant pain was improved, but still present, and told the claimant to return to the clinic in two months. (R. 283).

On January 8, 2001, Dr. Henson treated the claimant for discharge with a fishy odor and right lower quadrant pain; diagnosed the claimant with bacterial vaginosis; recommended a pelvic sonagram; prescribed Flagyl and Celbrex; and told the claimant to return to the clinic in two months. (R. 282).

On March 26, 2001, Dr. Henson treated the claimant for pelvic pain and noted that he previously prescribed Flagyl to treat the claimant's pelvic pain on January 8, 2001. Dr. Henson explained possible treatment options to the claimant including prescription pain medications and oral contraceptive pills.  (R. 281).

On February 19, 2003, Dr. Henson treated the claimant for menorrhagia, dysmenorrhea, and pain; noted that claimant's pap smear was within normal limits; and that the claimant had had a mammogram. (R. 280).

On January 26, 2004, Dr. Henson wrote a letter to Dr. John Morrison, a surgeon, asking Dr. Morrison to examine the claimant. In the letter, Dr. Henson noted that the claimant had experienced mild right lower quadrant pelvic pain for the last two or three years and that the claimant's pain had increased in intensity over the last six months. Dr. Henson also noted that the pain increased with palpitation and was particularly notable in the right supra pubic area and indicated that he believed the claimant had an inguinal hernia. (R. 277).

11

On January 26, 2005, Dr. Martha Jo Christian, an internist, referred the claimant to Dr. Henson because of the claimant's pelvic pain. Dr. Henson noted that the claimant had experienced pelvic pain for 2-3 years, but that the pain had gotten worse and become constant.  Dr. Henson prescribed Lortab and referred the claimant to a surgeon.[3] (R. 279).

On August 23, 2006, Dr. Henson treated the claimant for menorrhagia, dysmenorrhea, a slightly enlarged uterus, and bacterial vaginosis; recommended a sonagram of the pelvis; checked the claimant's follicle stimulating hormone, luteinizing hormone, and 17-β-estradiol; and prescribed Flagyl. (R. 276).

On September 6, 2006, Dr. Henson treated the claimant for a number of symptoms including menorrhagia, dysmenorrhea, and a slightly enlarged uterus; performed a pelvic sonar and lab work on the claimant; and recommended that the claimant return to the clinic as needed. (R. 275).

On June 5, 2008, Dr. Henson treated the claimant for heavy periods with clots and cramping the first two days; indicated that a urinary pregnancy test reported negative; that the claimant suffered from abnormal uterine bleeding, menorrhagia, dysmenorrhea, and an enlarged uterus; and that treating the claimant with oral contraceptive pills was unsuccessful. Dr. Henson indicated that he performed a pelvic ultrasound; recommended she return to the clinic in one to two weeks; and prescribed Lortab. (R. 274).

On July 28, 2008, Dr. Henson followed up with the claimant after performing a pelvic ultrasound on June 13, 2008 and indicated that he performed the ultrasound because of the

---

[3]The record does not clearly indicate who Dr. Henson referred the claimant to because two doctors' names are written beside "refer to surgeon." (R. 279). The names appear to be Dr. Christian and Dr. Morrison. The claimant saw both doctors in the course of her treatment.

12

claimant's enlarged uterus and abnormal uterine bleeding. (R. 273).

On August 6, 2008, Dr. Henson performed an endometrial biopsy on the claimant because of the claimant's abnormal uterine bleeding and indicated that the claimant should "proceed to surgery as planned "depending on the results of the endometrial biopsy. (R. 272).

On August 7, 2008, Dr. Martin D. Palmer, a pathologist, reported that the claimant's endometrial biopsy produced no evidence of hyperplasia or epithelialatypia. (R. 307-08).

On September 2, 2008, Dr. Henson treated the claimant for significant dysmenorrhea and pelvic pain; performed an endometrial biopsy; and reported no evidence of hypoplasia or cancer. Dr. Henson noted that the claimant had failed treatment with oral contraceptive pills and desired definitive treatment with a hysterectomy. Dr. Henson indicated that the claimant had an enlarged uterus, abnormal uterine bleeding, menorrhagia, significant dysmenorrhea, and pelvic pain; and that the claimant had a bilateral tubal ligation with a cesarian section in 1995. Dr. Henson stated that the claimant would have a total abdominal hysterectomy with conservation of the ovaries that day. He discussed the risks, indications, and alternatives to the surgery with the claimant. Dr. Henson performed the total abdominal hysterectomy on September 2, 2008 and noted that the claimant tolerated the procedure very well. (R. 251-53).

On September 4, 2008, Dr. Monnette S. Baker, a hematologist and anatomic pathologist, performed a surgical pathology report on the claimant's uterus and indicated that the uterus was slightly enlarged, but not distorted, and that the cervix had a Nabothian cyst formation. (R. 294-96).

On September 8, 2008, Dr. Henson removed the claimant's staples following her total abdominal hysterectomy and noted that the claimant did not present with redness or drainage. Dr.

Henson instructed the claimant on how to care for the incision site, and the claimant told him she understood. (R. 270).

On October 8, 2008, Dr. Henson treated the claimant for a lump and soreness in her left breast. Dr. Henson performed a blind mammogram; noted that there was a firm, tender nodule in the left breast; and recommended that the claimant return to clinic in two months. (R. 269).

On October 13, 2008, Dr. Bill Konetzki wrote a letter to Dr. Henson thanking Dr. Henson for referring the claimant to Dr. Konetzki and indicating that Dr. Konetzki performed a Tru-Cut Needle biopsy on the claimant's "highly suspicious left breast mass." (R. 255). Dr. Konetzki stated that he feared the biopsy would be diagnostic and that he would provide Dr. Henson with a path report. Dr. Konetzki attached an operative summary to the letter that indicated that Dr. Konetzki took several samplings of the lesion. (R. 255-57).

On October 17, 2008, Dr. Konetzki reported that the needle biopsies he performed on the claimant on October 13, 2008 returned a pathology report of invasive ductal carcinoma, moderately differentiated, grade II. He recommended modified radical mastectomy because of the size of the lesion; indicated that the claimant was scheduled for surgery on October 23, 2008; and noted that the claimant was "a well developed, well nourished, alert, oriented, intelligent, bright, and communicative forty year old African-American female in mild acute distress because of understandable anxiety." (R. 261). Dr. Konetzki indicated that the examination revealed a "normal right breast and left upper outer quadrant mass measuring 5-6 centimeters in greatest palpated diameter." *Id*.

On October 17, 2008, Dr. Randall W. Finley noted that he compared one of the claimant's previous mammograms from 2002 to the claimant's 2008 mammogram. Dr. Finley indicated that

14

the spiculated mass with focal architectural distortion and tumor microcalcification seen in the upper-outer breast on the 2008 mammogram was not present in the 2002 mammogram; the mass was a focal area of asymmetric and irregular shaped increased density in the upper-outer left breast with poorly delineated margins; the mass measured approximately 4.5 centimeters by 3 centimeters in size; and multiple linear and irregular shaped tumor microcalcifications existed. Dr. Finley concluded that the mass was most consistent with malignant neoplasm. (R. 319-20).

On October 20, 2008, Dr. Konetzki wrote a letter to Dr. Henson indicating that the claimant's needle biopsies showed infiltrating ductal carcinoma. In the letter, Dr. Konetzki indicated that the three specimens tested did not reveal evidence of lymmpho-vascular invasion, but that the three specimens did not speak for the remainder of the "rather large lesion." Dr. Konetzki stated that he discerned no axillary, supra-clavicular, or cervical lymphadenopathy and that the claimant's chest radiograph showed two questionable nodules in the inferior segments of the left upper lobe, but that they appeared artifactual. Based on these observations, Dr. Konetzki concluded that the lesion was a "IIa (T2, N0, M0) pre-operatively." (R. 268). Dr. Konetzki indicated that he discussed various surgical treatment options with the claimant and that she chose to undergo modified radical mastectomy on October 23, 2008. Dr. Konetzki stated that he thought the mastectomy was a "good choice" because of the superficial location of the mass and the potential for difficulty with local control of the disease and recommended that the claimant not be reconstructed until doctors were confident of local control. *Id.*

On October 23, 2008, Dr. Konetzki performed a modified radical mastectomy on the claimant's left breast and found that the claimant had a "grossly highly suspicious lymphadenopathy in the left axilla up to the apex of the anilla." (R. 262). Dr. Konetzki explained

15

that no attempt was made to perform a pectoralis minor saving procedure because it was taken in the procedure to get full exposure to the axilla and to do a thorough sweep of the axillary contents from the apex to the thoracic inlet. Dr. Konetzki indicated that he preserved the thoracodorsal and long thoracic nerves, but that he was unable to preserve the other neurovascular structures inferior to the left axillary vein. Dr. Konetzki noted that the claimant tolerated the procedure well and left the operating room in satisfactory condition and then discharged the claimant on October 25, 2008 noting that the claimant experienced an uneventful postoperative course and at the time of discharge the claimant had a Jackson Pratt drain that continued to drain a very small amount of serosanguinous fluid. Dr. Konetzki indicated that he believed the drain would be removed when the claimant visited his office two days later. (R. 262-64).

On October 27, 2008, pathologist Dr. Brian D. Ragland completed a pathology report for the claimant's biopsied breast tissue. Dr. Ragland stated that the left breast and axillary contents revealed invasive ductal carcinoma that was moderate to poorly differentiated; the carcinoma had a modified Bloom-Richardson score of seven out of nine; had focal lobular features; the tumor was three centimeters in its greatest dimension; and had a high nuclear grade with comedo necrosis comprising approximately twenty percent of the tumor volume. Dr. Ragland reported that six of the thirteen axillary lympnodes tested positive for metastatic ductal carcinoma and noted the presence of focal invasion beyond the lymph node capsule. (R. 292-93).

On November 5, 2008, Dr. Christopher Jordan, a medical oncologist, saw the claimant for recommendations regarding adjuvant treatment for her newly diagnosed breast cancer. Dr. Jordan noted that the claimant had a significant medical history for hypertension in the past, but that the

16

claimant was not taking medications for hypertension at the time of his evaluation but was taking Keflex and Lortab. Dr. Jordan noted that he discussed treatment options with the claimant including chemotherapy and the possible side effects of chemotherapy, such as hair loss, nausea, vomiting, low blood counts, and infection with the claimant and her mother. Dr. Jordan prescribed Compazine and Zofran and scheduled the claimant for a Multi Gated Acquisition (MUGA) scan to evaluate her heart function, a Positron Emission Tomography (PET) scan to rule out metastatic disease, and referred the claimant to Dr. Konetzki for insertion of a Groshon catheter. (R. 353-56).

On November 25, 2008, Dr. Jordan performed an initial staging exam on the claimant. As part of this examination, Dr. Jordan ordered, and Dr. James H. Bankston, Jr. performed, a PET scan and a noncontrast Computed Tomography (CT) imaging scan from the mid-skull through the mid-thigh. Dr. Jordan indicated that the CT images of the area where the claimant had a partial mastectomy did not reveal a definite mass-like appearance. Dr. Bankston noted that he did not find any areas of abnormal Fludeoxyglucose (FDG) uptake that suggested the presence of metastatic disease in the head and neck, but found a slight FDG uptake in the area where the claimant had a partial mastectomy. Dr. Bankston concluded that this uptake probably represented a postoperative change; however, a residual tumor could not be excluded. Dr. Bankston stated that no pulmonary nodules were seen and no abnormal uptake was seen in the mediastinum, abdomen, liver, or urinary tract. Dr. Bankston noted that he found a prominent enlargement in the left ovary that appeared to be largely comprised of a cystic area with a soft tissue component that showed marked hyper metabolism and concluded that the amount of hyper metabolism near the left ovary could indicate ovarian malignancy. Dr. Bankston stated that he did not see any free intra

17

peritoneal fluid. Dr. Jordan noted that there was mild focal hyper metabolism near the tip of L4 and L5 spinous processes. Dr. Bankston explained that the mild focal hyper metabolism at L4 and L5 was "most consistent with the degenerative change" and concluded that he did not find any convincing evidence of metastatic disease. (R. 350-51; 578-79).

On November 26, 2008, Dr. Jordan met with the claimant regarding her breast cancer and indicated that since being diagnosed with breast cancer, the claimant had become iron deficient and that he treated the claimant with intravenous iron. Dr. Jordan noted that the claimant's port was put in place despite the claimant's iron deficiency and indicated that the claimant was recovering from a partial hysterectomy, was status post left mastectomy, and was healing well. Dr. Jordan determined that the claimant had equal strength in all four extremities and moved all four extremities well. Dr. Jordan stated that the PET scan revealed postoperative bed change of the left modified radical mastectomy with small focus of mild to moderate uptake along the lateral chest wall and enlargement of the left ovary with marked hyper metabolic activity and that the hyper metabolic activity of the left ovary was "suspicious for possible ovarian malignancy." (R. 348). Dr. Jordan, however, indicated that the significance of the hyper metabolic activity was unclear and recommended that the claimant undergo an evaluation regarding the ovarian mass abnormality at UAB with Dr. J. Maxwell Austin, a gynecologic oncologist, as soon as possible. (R. 347-49).

On December 1, 2008, the claimant went to the UAB Division of Gynecologic Oncology for treatment of an ovarian cyst. Dr. Austin indicated that Dr. Jordan referred the claimant to UAB after finding a friable four centimeter cyst on the right ovary with increased metabolic activity. Dr. Austin concluded that the claimant had breast cancer with positive nodes and a left

18

adnexal mass with increased activity on PET-scan and scheduled a laparoscopic bilateral salpingo-oophorectomy (BSO) at Brookwood on December 4, 2008. (R. 333-34).

On December 8, 2008, Dr. Austin wrote a letter to Dr. Jordan indicating that Dr. Austin laparoscopically removed the claimant's tubes and ovaries because of a cyst; the claimant "only had a hemorrhagic corpus lutem with a blood clot in it on the ovary;" and the claimant did well. (R. 335).

On December 11, 2008, Dr. Jordan examined the claimant regarding her breast cancer diagnosis. Dr. Jordan noted that the claimant had invasive ductal carcinoma of the left breast with six of thirteen lymph nodes positive and that the claimant's ovarian area lit up on the claimant's post-operative PET scan. Dr. Jordan stated that Dr. Austin at UAB performed surgery on the claimant and found cystic disease of the left ovary but no evidence of any malignancy and indicated that Dr. Austin determined that the claimant was ready to begin chemotherapy. Dr. Jordan stated that the claimant's treatment plan consisted of four cycles of dose dense Adriamycin and Cytoxan every two weeks starting the following Monday followed by a Taxol dose every two weeks for four cycles followed by radiation. (R. 345-46).

The claimant underwent four cycles of dose dense Adriamycin and Cytoxan, followed by four cycles of Taxol and radiation. The claimant had Adriamycin and Cytoxan on December 15, 2008, December 29, 2008, January 12, 2009, and January 26, 2009. At each treatment, Dr. Jordan indicated that the claimant was tolerating the chemotherapy well and only had mild nausea. On December 29, 2008, Dr. Jordan indicated that the claimant complained of significant myalgias and arthralgias that were not controlled with over-the-counter medication and two small sores in

her mouth. Dr. Jordan prescribed Lortab for pain relief and Magic Mouthwash with added Nystatin to treat the claimant's mouth sores. (R. 342-44; 366-67; 526).

On January 7, 2009, the claimant filled out a Function Report. In this report, the claimant indicated that her illnesses and injuries had affected her ability to lift, reach, concentrate, and use her hands. The claimant did not indicate that her condition had in anyway affected her ability to squat, bend, stand, or walk, (R. 202).

On January 22, 2009, Dr. Jordan treated the claimant for a small pimple-like lesion in the claimant's perirectal area. Dr. Jordan noted that the claimant had two small bilateral lesions, one of which was open and draining pus; indicated that the lesions were tender to the touch and non-indurated; prescribed Doxycycline; recommended that the claimant take Epsom salt and sitz baths; and told the claimant to "return to the clinic at her next scheduled visit with lab for planning further chemotherapy." (R. 368-69).

After completing four rounds of dose dense Adriamycin and Cytoxan, the claimant underwent doses of Taxol on February 9, 2009, February 23, 2009, and March 9, 2009. Dr. Jordan indicated that overall the claimant tolerated the treatment very well, had a good energy level, and a good appetite, despite a little nausea. On February 9, 2009, and February 23, 2009, Dr. Jordan indicated that the claimant reported arthralgias and myalgias that the claimant treated with over-the-counter Tylenol and Motrin. On March 9, 2009, Dr. Jordan reported that the claimant experienced itching after her dose of Taxol that the claimant treated with Benadryl. Dr. Jordan called in a Medrol Dose Pack, prescribed Prednisone, and instructed the claimant to take Benadryl as needed. (R. 514-16; 503-05; 492-93).

20

On March 31, 2009, Dr. Melanie D. Graham saw the claimant for consideration of chest wall and nodal radiotherapy and noted that the claimant had experienced hot flashes and had taken Celexa and Lexapro, but did not notice the medications making a difference in the hot flashes and was not taking either medication at the time of Dr. Graham's examination. Dr. Graham noted that the claimant had experienced some pain in her feet and knees since ending chemotherapy; recommended chest wall and nodal radiotherapy; and stated that she discussed the treatment in detail with the claimant. Dr. Graham prescribed Lortab, Keflex, and Effexor. (R. 475-77).

On April 9, 2009, Dr. Konetzki removed the claimant's port and catheter via surgery and noted that the claimant tolerated the procedure well. Dr. Konetzki indicated that the claimant's extremities were normal without edema or deformity. (R. 415-16).

On May 21, 2009, Dr. Graham indicated that the claimant completed a course of external beam radiation to the left chest wall and supra-clavicular area; that the claimant tolerated the treatment extremely well; and that the treatment was complete. (R. 483).

On May 26, 2009, Dr. Jordan saw the claimant for a follow-up regarding her breast cancer; indicated that the claimant had completed chemotherapy and radiation; noted that the claimant did not have edema in any of her extremities; and recommended that the claimant return to the clinic in six weeks for a follow up. (R. 466).

On July 13, 2009, the claimant had a checkup at Oncology Associates of West Alabama with Dr. Jordan. Dr. Jordan indicated that the claimant had recuperated well from completion of chemotherapy and only had minimal intermittent neuropathy. Dr. Jordan noted that the claimant had left arm lymphedema; the claimant had a lymphedema sleeve; and the claimant stated she experienced pain in her left arm and requested pain medication. In response to the claimant's arm

pain, Dr. Jordan increased the claimant's Lortab prescription. Dr. Jordan noted that the claimant previously had a CT scan of the chest, abdomen, and pelvis that did not reveal any convincing evidence of metastatic disease. (R. 458-60).

On July 15, 2009, Dr. Jordan filled out a "Medical Statement Regarding Cancer for Social Security Disability Claim" form. On this form, Dr. Jordan indicated that the claimant could work two hours a day and that the claimant could stand for fifteen minutes, sit for sixty minutes, frequently lift five pounds and occasionally lift twenty pounds. (R. 403).

On August 21, 2009, Dr. Konetzki wrote a note stating that the claimant was unable to continue working her present job: "[a]s a consequence of post-operative changes, she is unable to do work involving overhead lift and pulling as her current work description requires. This restriction will be permanent." (R. 629). Dr. Konetzki did not indicate any other limitations on the claimant's abilities. *Id*.

On September 11, 2009, Dr. Christian reported that an ENT stated that the claimant's ear was "okay."[4] Dr. Christian indicated that the ENT believed the muscle in the claimant's left shoulder and arm caused the claimant's earache and had recommended a muscle relaxer or therapy. Dr. Christian indicated that a Dr. Walburn prescribed Esgic-Plus for the claimant. Dr. Christian noted that the claimant needed a new prescription because she ran out of medicine. (R. 627).

---

[4]The record contains no evidence of the claimant's visit to the ENT. Dr. James H. Walburn is an ENT in Tuscaloosa, AL and could be the ENT the claimant saw. However, the record only refers to a "Dr. Walburn" with no indication as to where the claimant saw Dr. Walburn or whether Dr. Walburn is, in fact, an ENT. (R. 627).

On September 22, 2009,[5] the claimant wrote that she "came to Aptor Physical Therapy after [her] surgery. [She] had pain and soreness . . . . After 2 weeks of therapy [she] can move [her] neck, arm, shoulder better and no pain." (R. 445).

On October 16, 2009, Dr. Graham treated the claimant for swelling and stiffness in her left arm and shoulder. Dr. Graham stated that the claimant wore a compression sleeve; the claimant's right mammogram and chest X-ray were clear; and the claimant had an appointment with a physical therapist the following week. Dr. Graham prescribed a new compression sleeve. (R. 619-20).

On October 26, 2009, physical therapist Jennifer Doyle saw the claimant for treatment of the claimant's left arm lymphedema. Ms. Doyle indicated that the claimant noticed swelling on October 23, 2008; the claimant stated the swelling was painful; and the claimant saw improvement with a compression sleeve. Ms. Doyle stated that the claimant's Deep Vein Thrombosis (DVT) tests were negative and concluded that the claimant was between Stage 1 and Stage 2 lymphedema and that the lymphedema limited the claimant's ability to do chores around the house and community. Ms. Doyle indicated that the claimant understood the at-home treatment program and stated that the claimant "ha[d] a good potential for success." (R. 614-15).

*The ALJ Hearing*

On April 15, 2010, the ALJ held a video hearing. The claimant appeared in Tuscaloosa, Alabama, and the ALJ presided from Birmingham, Alabama. (R. 44).

---

[5]The record indicates that the claimant signed her statement that "after 2 weeks of therapy I can move my neck, arm, shoulder better and no pain" on September 22, 2008. However, all of the claimant's records from Aptor Physical Therapy are dated from September to November of 2009.  Additionally, the medical records all indicate that the claimant's left arm pain did not begin until after the claimant's mastectomy in October 2008. (R. 445).

At the hearing, the claimant testified that she completed the twelfth grade in special education classes. The claimant explained that she began taking all special education classes in fifth grade. The claimant stated that she had particular problems with reading. She explained that she could only read a little bit, but that she could not understand what she read without help. (R. 49-51). The claimant stated that she could read at a second or third grade reading level and that when she was in school the teacher read tests to her because she could not read. (R. 57).

The claimant testified that she stopped working in August 2008 as an inspector with Fayette Glove Company because of a hysterectomy and subsequent diagnosis with breast cancer. The claimant stated that she returned to work for a few weeks after her hysterectomy, but that she left work again on October 16, 2008 after learning that she had breast cancer and had not been able to return. (R. 49; 55).

The claimant stated that she was unable to work because she experienced pain and swelling in her left leg, arm, shoulder, and underarm and was "depressed all the time because [she could not] do the things that [she] used to do." (R. 50). The claimant also testified that her arm and legs sometimes got numb and that her back hurt if she sat for too long.  The claimant explained that the pain and numbness in her left side prevented her from laying on her left side and lifting her arm above her head. When asked how much weight she believed she could lift off of a table, the claimant stated that she could probably lift about five pounds. The claimant also said that numbness in her left leg and pain in her back affected her ability to stand for long periods of time and that she could probably stand for thirty minutes to an hour and could probably sit for thirty minutes to an hour. (R. 49-52).

The claimant testified that she treated her pain with Lortab and muscle relaxers that made

24

her drowsy and sleepy; she took naps throughout the day; and probably slept a total of four to five hours during the day. The claimant stated that the medications did not help her pain, but that going to the chiropractor eased her pain if she took "about three or four Lortabs within a daytime." The claimant, however, stated that the pain did not completely stop. (R. 52-53; 55).

The claimant stated that she became depressed right after her surgery and explained that because of her depression she did not like to be around too many people, but that she could go to church. She also stated that during the day she sometimes had crying spells where she "could just be sitting in a chair, [and] just, you know, start crying or just by me talking to anybody . . . ." (R. 53). The claimant testified that she spent most of her time sitting, watching TV, or sleeping but indicated that she tried to fix something for her kids to eat before they get out of school. The claimant testified that she was taking antidepressant medications, but that they did not help and made her sleepy. (R. 53-54).

The claimant testified that she lived with her husband and two children and that her mother helps her take care of her children. (R. 54). The claimant testified that her cancer was in remission and that the primary reasons she could not work were her depression and her inability to use her left arm. (R. 57-58).

After the claimant testified, Dr. David Head, a vocational expert, appeared before the ALJ. Dr. Head testified that the claimant worked at the Fayette Glove Company where the claimant stacked and packaged gloves and stated that this type of work was consistent with the job of a turner and a former in a glove factory. Dr. Head indicated that a glove turner was a light, unskilled job with a specific vocational preparation (SVP) of two. Dr. Head testified that the claimant also worked at Gateway Homes where the claimant cleaned out trailers after assembly or

25

renovation and classified this type of work as a medium, unskilled job with an SVP of two. Dr.

Head indicated that the claimant also worked as an institutional attendant at the The Arc of

Fayette and Lamar Counties, an institution for the mentally disabled and classified this type of

work as medium, semi-skilled labor with an SVP of three. (R. 62)

The ALJ then asked Dr. Head to consider an individual with the same age, education, and

work experience as the claimant that was limited to lifting, carrying, standing, and walking at no

more than the light exertional level, could not use her non-dominant left upper extremity for

pushing, pulling, or overhead reaching, could only occasionally climb ramps or stairs, should not

climb ladders, ropes, or scaffolds, could occasionally stoop, kneel, crouch, or crawl, could read at

only the early elementary school level, and was limited to performing simple, routine, and

repetitive tasks in a work environment free of fast-paced production requirements that involved

only simple work-related decisions with few, if any, changes in the workplace, and could only

occasionally engage in interpersonal interaction. The ALJ asked Dr. Head if an individual with

those limitations could perform the claimant's past work, and Dr. Head testified that a person

with those limitations could not perform the claimant's past work. (R. 64).

Next, the ALJ asked Dr. Head if a person with the above list of limitations could perform

any work, and Dr. Head testified that such a person could perform light cleaning jobs that did not

require pushing and pulling a broom or a vacuum, such as cleaning offices on a night crew and

stated that 2,500 such jobs existed statewide and 105,000 existed nationwide. Dr. Head testified

that a person with such limitations also could be a sorter, a light, unskilled, SVP two job. Dr.

Head indicated that 1,100 such jobs existed statewide and 55,000 existed nationwide. Dr. Head

stated that a person like the claimant also could work as a material handler, a light, unskilled, SVP

26

two job. Dr. Head indicated that 1,500 such jobs existed statewide and 65,000 existed nationwide. (R. 65-66).

Then the ALJ asked Dr. Head if an individual with the above list of limitations and the additional limitation of needing to alternate between sitting and standing could find work. Dr. Head answered that it would depend on the amount of sitting required, but that light work would allow for some sitting. Dr. Head testified that if the cumulative sitting exceeded one hour the limitation would preclude the above-mentioned jobs. However, Dr. Head indicated that other jobs existed for an individual with the additional limitation and testified that such a person could work as a bench hand, which is a sedentary, unskilled job with an SVP of two. Dr. Head stated that 2,300 such jobs existed statewide and 100,000 existed nationally. Dr. Head testified that such a person could also work as a surveillance system monitor and that 1,000 such jobs existed statewide and 60,000 existed nationally. Dr. Head mentioned a third job, but the record does not indicate what kind of job it was. (R. 66-67).

The ALJ then asked Dr. Head if a person who had the additional limitations outlined in Dr. Jordan's "Medical Statement Regarding Cancer for Social Security Disability Claim" could find work that existed in significant numbers in the economy. Dr. Head testified that no such jobs existed and explained that the most problematic suggested limitation was that the claimant could work no more than two hours a day. (R. 67-68).

Next, the ALJ asked Dr. Head if, based on the claimant's testimony regarding her abilities and limitations, any occupations existed that an individual having the same age, education, and work experience as the claimant could perform. Dr. Head testified that no such jobs existed and explained that the primary factors that would preclude the claimant from working included the

27

claimant's pain; amount of time spent being drowsy or sleepy or lying down; the limitations on the amount of time the claimant can sit and/or stand, and the claimant's "crying a lot." (R. 68).

The ALJ then asked the claimant who Dr. Jordan was, and the claimant answered that Dr. Jordan was her cancer doctor. The ALJ then confirmed that the date on the bottom of Dr. Jordan's recommended limitations was July 15, 2009, two months after the claimant finished chemotherapy. (R. 69).

*The ALJ's Decision*

After the hearing, the ALJ issued a decision on May 21, 2010. (R. 14-33). The ALJ held that the claimant was not disabled within the meaning of the Social Security Act from August 26, 2008. (R. 17).  In making his decision, the ALJ followed the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920. (R. 14-33).

First, the ALJ determined that the claimant meets the insured status requirements of the Social Security Act through December 31, 2013. (R. 19).

Next the ALJ determined that the claimant had not engaged in substantial gainful activity since August 26, 2008. The ALJ noted that the claimant left work in August 2008 after having a hysterectomy and tried to return to work after a few weeks, but the ALJ explained that the claimant had to leave work again because she was diagnosed with breast cancer and had surgery in October 2008. The ALJ concluded that the claimant was never able to return to work. *Id*.

Then the ALJ found that the claimant was severely impaired by adjustment disorder with depressed mood, Borderline Intellectual Functioning, neoplasm of the breast, and left arm lymphedema. The ALJ stated that the combination of these impairments "constitute[s] more than a slight abnormality and ha[s] had more than a minimal effect on the claimant's ability to perform

28

basic work activities for a continuous period of 12 months." *Id.*

Next, the ALJ held that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1. *See* 20 C.F.R. 404.1520(d), 404.1526. The ALJ explained that he based his conclusion on specifically considered Listings 13.10. The ALJ stated that he considered the fact that no physician had suggested the existence of any impairment or combination of impairments which would meet or medically equal the criteria of any listed impairment. (R. 19-20).

The ALJ also stated that the claimant's mental impairments did not meet or medically equal the criteria of Listings 12.02, 12.04, and 12.05. The ALJ explained that the claimant did not meet 12.02 paragraph B, 12.04 paragraph B, or 12.05 paragraph D because the claimant's mental impairments did not markedly restrict her activities of daily living; did not create marked difficulties in maintaining her social functioning; and did not create marked difficulties in the claimant's abilities to maintain concentration, persistence, or pace. The ALJ also noted that the claimant had not experienced repeated, extended episodes of decompensation and was only mildly restricted in her activities of daily living. The ALJ reasoned that the claimant reported that she was able to live independently and take care of her personal needs, even though the claimant stated that she needed help getting dressed, bathing, and doing household work. The ALJ also noted that the claimant's mother helped the claimant. The ALJ concluded that the claimant had moderate social functioning difficulties. The ALJ explained that the claimant got along with authority figures and handled changes in routine pretty well. (R. 20).

The ALJ also noted that the claimant went to church every Sunday and spent time with

her children. The ALJ stated that the claimant did not handle stress well; cried frequently; and had some difficulty understanding, remembering, and carrying out instructions. The ALJ noted that the claimant had not experienced any episodes of decompensation that had been of extended duration. The ALJ concluded that the claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation; therefore the claimant did not meet the criteria of 12.02 paragraph B, 12.04 paragraph B, and 12.05 paragraph D. *Id*.

The ALJ also evaluated, and determined that the claimant did not meet, the criteria established in 12.02 paragraph C and 12.04 paragraph C. The ALJ reasoned that the claimant did not meet the 12.02 and 12.04 paragraph C provisions because the claimant did not establish repeated episodes of, or a propensity towards, decompensation; the need for a highly supportive living arrangement; or the inability to function independently outside of her home. (R. 20-21).

Next, the ALJ evaluated 12.05 paragraph A, which is met when a claimant is dependent on others for personal needs like toileting, eating, dressing, or bathing and an inability to follow directions. The ALJ determined that the claimant did not meet the requirements of 12.05 paragraph A because the claimant testified she was able to live and function independently with some assistance. The ALJ also stated that the claimant was able to follow directions well enough to complete the WAIS-IV examination. The ALJ also noted that the claimant was in special education classes, but made "quite good" grades. (R. 21).

Then the ALJ determined that the claimant did not meet the 12.05 paragraph B criteria because the claimant did not have a valid verbal, performance, or full scale IQ of 59 or less. *Id*.

Next, the ALJ determined the claimant did not meet the 12.05 paragraph C criteria. The

ALJ reasoned that the claimant did not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation on function. The ALJ explained that, even though the claimant's tested IQ scores fell within the 60-70 range, the consultative examiner who performed the IQ test stated that the scores underestimated the claimant's level of functioning. The ALJ also noted that the claimant denied the significant deficits in adaptive functioning that would be required to meet the Listing. *Id*.

The ALJ then evaluated the claimant's residual functional capacity. The ALJ determined that "the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except that she can never use her non-dominant left upper extremity for pushing or pulling, can occasionally climb stairs and ramps, can never climb ladders, ropes, or scaffolds, can occasionally stoop, kneel, crouch, and crawl, and can never reach overhead with the left upper extremity." (R. 22). Additionally, the ALJ determined that the claimant "can read at an early elementary school level, can perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements that involve [sic] only simple work-related decisions and few changes in the workplace, and can have occasional interpersonal interaction." (R. 21). The ALJ also found that the claimant "can only perform work that allows her to alternate between sitting and standing throughout the workday." (R. 22).

The ALJ explained that he followed a two step process. First, he determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. Second, the ALJ determined to what extent the intensity, persistence, and limiting effects of the claimant's symptoms limited the

claimant's functioning. *Id*.

The ALJ noted that the claimant testified that she quit working in August 2008 because she had a hysterectomy and was diagnosed with breast cancer and that she was disabled due to breast cancer and depression. The ALJ noted that the claimant stated she was cancer free, but had to go to the doctor every six months and had side effects from her chemotherapy and radiation treatment. *Id*.

The ALJ also noted that the claimant testified she was unable to lift her left hand over her head; had left side, neck, and arm pain; had swelling under her arm; had constant pain; was depressed all the time; had numbness in her shoulder, neck, left arm, and left leg; and had pain in her back when she sat for too long. The ALJ reported that the claimant testified that she could lift five pounds, stand for thirty minutes to an hour, and sit for thirty minutes to an hour. The ALJ indicated that the claimant testified that she took Lortab, a muscle relaxer, and an antidepressant that made her sleepy and that she slept off and on during the day. *Id*.

The ALJ acknowledged that the claimant stated she had problems reading and understanding and was in special education classes. The ALJ also indicated that the claimant testified that she did not like to be around many people and had crying spells. The ALJ noted that the claimant testified that the primary reason she could not work was because of her depression. *Id*.

The ALJ noted that the claimant underwent a total abdominal hysterectomy in September 2008 because the claimant had an enlarged uterus, abnormal uterine bleeding, menorrhagia, significant dysmenorrhea, pelvic pain, and had previously failed outpatient management. The ALJ also noted that in October 2008, the claimant underwent a biopsy of a malignant neoplasm in her

left breast that turned out to be an invasive ductal carcinoma. Of the claimant's thirteen

lymphnodes, six tested positive for invasive ductal carcinoma. The ALJ stated that the claimant

underwent a modified radical mastectomy in October 2008 and that in November 2008 the

claimant had an abnormal PET scan showing a left ovarian mass with hypermetabolic activity and

recommended an evaluation at UAB. The ALJ also noted that the claimant did not begin

chemotherapy at this visit because she was iron deficient, but that the claimant did have a port

placed. The ALJ noted that the claimant underwent a laparoscopic BSO in December 2008

because of her abnormal PET scan in November 2008. (R. 22-23).

The ALJ stated that the claimant began chemotherapy in December 2008 and indicated

that the claimant took Adriamycin, Cytoxan, and Taxol every two weeks as part of her

chemotherapy regimen. The ALJ noted that the claimant complained of mild nausea, significant

myalgias and athralgias, and sores in her mouth after her first dose of chemotherapy. The ALJ

indicated that the claimant underwent her second dose of chemotherapy and was prescribed

Lortab. The ALJ stated that the claimant received her third round of chemotherapy in January

2009 and that the claimant's doctors noted the claimant was doing well and had no new

complaints. The ALJ noted that later that month the claimant was on dose dense chemotherapy

with AC Taxol, and the doctor noted that after three cycles of AC the claimant was tolerating it

well. The ALJ indicated that in February 2009 the claimant underwent two chemotherapy

treatments and reported that she was feeling well. (R. 23).

The ALJ stated that the claimant underwent a psychological consultative examination in

February 2009 where the claimant reported that she was undergoing treatment for breast cancer;

was anxious, depressed, and irritable; that her symptoms began when she was diagnosed with

33

breast cancer; that she had received antidepressant medication since December of 2008 but had not received inpatient mental health treatment; and that the claimant indicated that her depression would alleviate if her cancer was successfully treated. The ALJ also noted that Dr. Griffin concluded that the claimant appeared to meet the criteria for adjustment disorder with depressed mood, even though her depressive symptoms were partially controlled with medications; the claimant's depression appeared to be the direct result of breast cancer; if the claimant's cancer went into remission or was successfully treated, the claimant would probably no longer be depressed; the claimant's symptoms were valid but would not preclude her from employment; the claimant was capable of simple, unskilled labor; and the claimant's concentration might show marked improvement once the claimant's affective symptoms were controlled. *Id*.

The ALJ indicated that in March 2009 Dr. Jordan saw the claimant for chemotherapy, itching, and consideration of chest wall and nodal radiotherapy. The ALJ noted that during that visit, Dr. Jordan refilled the claimant's Lortab prescription and prescribed Keflex and Effexor. The ALJ stated that the claimant underwent a left upper extremity venous ultrasound in April 2009 because the claimant had been complaining of left shoulder pain and swelling that radiated into her arm.  The ALJ indicated that the left upper extremity venous ultrasound did not reveal DVT and that the claimant completed chemoradiation in April 2009. (R. 24).

The ALJ indicated that in May 2009 the claimant's left arm swelling decreased; the claimant completed a course of external beam radiation to the left chest wall and supra-clavicular area; and that the doctor indicated that the claimant tolerated the therapy extremely well. *Id*.

The ALJ stated that in July 2009 the claimant underwent a CT of her chest, upper abdomen, and pelvis that revealed no conclusive evidence of metastic disease in any of the three

areas. The ALJ noted that Dr. Jordan stated that the claimant had recuperated well from the chemotherapy, but that the claimant indicated that she had "very minimal intermittent neuropathy" and body aches; and the claimant experienced pain in her left arm because of lymphedema even though she had a lymphedema sleeve. *Id*. The ALJ indicated that Dr. Jordan increased the claimant's Lortab prescription because of the claimant's continued left arm pain. *Id*.

The ALJ noted that the claimant's family physician, Dr. Brock,[6] treated the claimant in July 2009 for a headache and pain below the claimant's ear and that the claimant returned to Dr. Brock in September 2009. The ALJ stated that Dr. Brock noted that the claimant had seen an ENT who said that the claimant's ear was okay and that the claimant's muscle spasms in her left shoulder and arm were causing the pain to go up behind her ear. The ALJ indicated that, according to Dr. Brock's notes, the ENT recommended a muscle relaxer or therapy. The ALJ noted that the claimant underwent physical therapy for upper back and neck pain in September 2009 and, after two weeks of therapy, the claimant indicated she could move her neck, arm, and shoulder better and was not having any pain. *Id*.

The ALJ indicated that the claimant returned to Oncology Associates of West Alabama in October 2009 complaining of left arm swelling and some stiffness in her left shoulder. The ALJ stated that later that month, a physical therapist noted that the claimant appeared to be in Stage 1 or Stage 2 lymphedema and had significant functional limitations. The ALJ noted that the claimant's treatment consisted of a compression sleeve and a home-management program. The ALJ also noted that the claimant had a right breast mammogram, a nuclear medicine bone scan, a

---

[6]Though the ALJ refers to a "Dr. Brock," no evidence of the claimant visiting Dr. Brock exists in the record.  Instead, the evidence discussing the claimant's ear problems all appears to be from Dr. Martha Jo Christian.

unilateral two-view mammogram, and an annual check-up for breast carcinoma that revealed no suspicious findings or metastases. (R. 24-25). The ALJ also noted that the claimant still was suffering from lymphedema of the left arm, wearing a compression sleeve, and taking Lortab in December 2009. (R. 25).

The ALJ noted that in March 2010 a family physician, Dr. Christian, treated the claimant; indicated that the claimant had seen a chiropractor for her neck and left shoulder; and noted that the claimant stated that the chiropractor helped. The ALJ noted that the claimant continued to take Lortab. *Id*.

The ALJ concluded that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment. The ALJ explained that "the claimant simply alleges a greater degree of debilitation than what objective evidence and the record as a whole can support." *Id*. The ALJ stated that Dr. Griffin indicated that the claimant's tested IQ scores represented an underestimate of her intellectual functioning and that Dr. Griffin stated that the claimant's mental impairments were only moderate in severity. The ALJ indicated that Dr. Griffin based his conclusions on the GAF score of 60 and the result of the claimant's physical diagnoses. The ALJ also reiterated Dr. Griffin's conclusion that the claimant was capable of performing unskilled work. The ALJ concluded that the claimant's cancer was in remission and that, although the claimant still suffered from lymphedema, physical therapy and chiropractic treatment improved the swelling. *Id*.

The ALJ noted that the claimant did not indicate musculoskeletal weakness, focal motor

36

or sensory deficits, and had full extremity strength.  The ALJ also noted that the claimant denied

adverse medication side effects and did not indicate that she had any problems bending, squatting,

sitting, standing, walking, or climbing stairs. The ALJ stated that the claimant also did not indicate

that she had problems remembering, following instructions, getting along with others, or paying

attention. The ALJ stated that he considered the claimant's "limitations incident to her borderline

intellectual functioning." *Id*. The ALJ concluded that, although the claimant had some limitations

due to her physical and mental impairments, the limitations were accounted for in the RFC and did

not prevent the claimant from all manner of employment. (R. 25-26).

Next, the ALJ addressed the weight he gave to the evidence. The ALJ stated that he gave

significant weight to the opinion of the state agency psychological consultant, Dr. Roque. The

ALJ stated that Dr. Roque was highly qualified and that her opinion was consistent with the

record as a whole. The ALJ also stated that he gave significant weight to Dr. Konetzki, who

indicated that the claimant should be precluded from overhead lifting and pulling with her left

upper extremity and that he incorporated Dr. Konetzki's conclusion into the RFC. The ALJ stated

that he gave little weight to the Dr. Christopher Jordan's opinion because the "opinion was

assessed in an unsupported fashion on a check-off type form report completed shortly after the

claimant's completion of radiation treatment and before the improvement that would be noted in

subsequent reports." (R. 26). The ALJ also concluded that the record as a whole did not support

Dr. Jordan's opinion and that Dr. Jordan's exertional restrictions were inconsistent with the

claimant's own documentary submissions. Ultimately, the ALJ determined that the claimant is

capable of performing work consistent with the RFC. *Id*.

The ALJ then concluded that the claimant was unable to perform any past relevant work.

The ALJ explained that the vocational expert, considering the claimant's RFC and previous work experience, testified that the claimant could not perform any of her previous work. *Id*.

The ALJ determined that the claimant was forty years old and, therefore, a younger individual at the onset of the alleged disability. The ALJ noted that the claimant had at least a high school education and was able to communicate in English and that transferability of job skills was not an issue because the claimant's past relevant work was unskilled. (R. 26-27).

Next, the ALJ concluded that jobs still existed in significant numbers in the national economy that the claimant could perform. The ALJ stated that he considered the claimant's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2 when he made his decision. The ALJ also stated that the claimant's additional limitations impeded the claimant's ability to perform all, or substantially all, of the requirements of the light level of work. To determine how these additional limitations affected the claimant's ability to work, the ALJ indicated that he asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC. The ALJ noted that the vocational expert testified that an individual with the claimant's aged, education, work experience, and RFC would be able to work and provided examples of work an individual like the claimant could perform such as a cleaner, a sorter, and a material hander. The ALJ indicated that the vocational expert testified that 2,500 cleaner jobs existed in the state and 105,000 existed nationally; 1,100 sorter jobs existed in-state and 55,000 existed nationwide; and 1,500 material hander jobs existed in the state and 65,000 jobs existed nationwide. *Id*.

The ALJ also indicated that the vocational expert stated that the claimant could perform

sedentary occupations such as a bench hand, a surveillance system monitor, and an inspector. The ALJ noted that the vocational expert indicated that 2,300 in-state and 100,000 nationwide bench hand jobs existed; 1,000 in-state and 60,000 nationwide surveillance system monitor jobs existed; and 2,300 in-state and 98,000 nationwide inspector jobs existed. The ALJ concluded that the claimant could make a successful adjustment to other work that existed in significant numbers in the national economy based on the vocational expert's testimony, the claimant's age, education, work experience, and RFC. *Id.*

Finally, the ALJ concluded that the claimant had not been under a disability as defined in the Social Security Act from August 26, 2008 through the date of his decision. (R. 27-28).

## VI. DISCUSSION

(1) The ALJ had substantial evidence to support his conclusion that the claimant did not meet the requirements of 12.05(C) and, therefore, did not commit reversible error when he determined that the claimant suffered from Borderline Intellectual Functioning.

The claimant argues that the ALJ erred when he determined that the claimant did not meet the Listing for mental retardation 12.05(C). Pl.'s Br. 5. The court finds that substantial evidence existed to support the ALJ's decision that the claimant did not meet the Listing for 12.05(C). To meet the Listing 12.05(C), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton*, 120 F.3d at 1219-20. A claimant usually meets the 12.05(C) criteria when he has a valid IQ score between 60 and 70 and has an additional mental or physical impairment that significantly affects the claimant's ability to work. *Crayton*, 120 F.3d at 1219-20; *see also Lowery*, 979 F.2d at 837.

Here, the claimant presented an IQ score of 62 along with evidence of cancer,

39

lymphedema, and depression. The ALJ determined that the claimant had the severe impairments

of adjustment disorder with depressed mood, neoplasm of the breast, and left arm lymphedema.

The ALJ concluded that the claimant's IQ score was invalid because Dr. Griffin stated that the IQ

score underestimated the claimant's abilities and because no other evidence supported the

conclusion that the claimant suffered from mental retardation. In fact, Dr. Griffin indicated that

the claimant's IQ score was not entirely reliable. When Dr. Griffin conducted the IQ test, he

stated that the results underestimated the claimant's true abilities and concluded that it would be

premature to diagnose the claimant with Mild Mental Retardation. (R. 373-375). Moreover,

during Dr. Griffin's evaluation, the claimant denied a long history of psychiatric treatment and did

not report significant difficulties with adaptive functioning skills that would imply mental

retardation. (R. 372-73). No other medical evidence exists to support the validity of the

claimant's IQ tests. In fact, the claimant's school records are the only other pieces of evidence

suggesting that the claimant had any learning disabilities. The claimant's school records indicate

that the claimant was enrolled in special education classes, but that she completed high school

without repeating any grade and made mostly As and Bs. (R. 237-38). Because no conclusive

evidence exists to show that the IQ test was valid, but several pieces of evidence exist that

suggest the IQ test was invalid, the ALJ based his determination that the IQ test was invalid on

substantial evidence.

 Although an ALJ cannot arbitrarily substitute his own diagnosis for that of a medical

opinion, the ALJ is entitled to reject a medical opinion if substantial evidence contradicts the

opinion. *Marbury*, 957 F.2d at 840-41; *Syrock*, 764 F.2d at 835. This means that an ALJ's

decision is not tied to any one piece of evidence; as long as substantial evidence exists to support

the ALJ's conclusion, his determination will be upheld. *Popp*, 779 F.2d at 1499; *Graham*, 129 F.3d at 1422.

Here, the ALJ did not arbitrarily substitute his own diagnosis for a medical opinion when he determined that the claimant suffered from several severe impairments, including Borderline Intellectual Functioning. (R. 19). Instead, the ALJ explained that he rejected Dr. Griffin's IQ test because evidence existed to show it was invalid. For example, Dr. Griffin and Dr. Roque both questioned the validity of the test and indicated that it underestimated the claimant's mental abilities.  The ALJ then went on to conclude that, although the claimant suffered from various mental limitations, the claimant did not meet or medically equal the heightened requirements of Mild Mental Retardation and, therefore, the claimant suffered from Borderline Intellectual Functioning.

After stating that the claimant suffers from Borderline Intellectual Functioning, the ALJ meticulously explained the claimant's mental limitations. The ALJ recognized that the claimant took all special education classes but made good grades, completed high school, held several jobs, and was married with two children. The ALJ also specifically included the claimant's mental limitations in several hypotheticals to the vocational expert. The ALJ's determination that the claimant suffered from the severe impairment of Borderline Intellectual Functioning is the ALJ's concise method of stating that, although the claimant suffers from mental impairments, the claimant does not meet the heightened requirements of Mild Mental Retardation. Therefore, the ALJ did not commit reversible error when he stated that the claimant suffered from the severe impairment of Borderline Intellectual Functioning. He used the term to indicate that the claimant suffered from mental impairments, but did not meet the  heightened requirements to be considered

41

mildly mentally retarded.

(2) The ALJ applied the appropriate legal standard to the claimant's treating physician's testimony.

The claimant also argues that the ALJ did not apply the appropriate legal standard when he evaluated Dr. Jordan's July 15, 2009 statement that the claimant could only work for two hours. (R. 403). The claimant argues that the ALJ should have given Dr. Jordan's opinion controlling weight because Dr. Jordan was the claimant's treating physician. However, an ALJ is entitled to disregard a treating physician's opinion if good cause exists. *Phillips*, 357 F.3d at 1240. Good cause to disregard a treating physician's opinion exists in three instances: "[when] the (1) treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was inconsistent with the doctor's own medical records." *Id*. at 1240-41. As discussed below, all three instances are present in this case; thus, the ALJ had good cause to ignore Dr. Jordan's evaluation indicating that the claimant could only work for two hours.

First, the evidence did not bolster Dr. Jordan's opinion. The ALJ explained that the evidence did not support Dr. Jordan's opinion because he gave the opinion only two months after the claimant completed her cancer treatment and, therefore, did not take into consideration later improvements to the claimant's health. Moreover, other doctors on record and the claimant herself indicated that the claimant was not as limited as Dr. Jordan's evaluation suggests.

Second, the evidence supported a contrary finding. Most of the evidence suggested that the claimant's only physical limitation was that she could not use her left arm for overhead lifting, pushing, or pulling. For example, the claimant stated in January 2009, that her condition had only affected her ability to lift, reach, concentrate, and use her hands. (R. 202). Furthermore, on

August 21, 2009, another of the claimant's treating physicians, Dr. Konetzki, indicated that the claimant was "unable to do work involving overhead lift and pulling," but indicated no other limitations on the claimant's ability to work.  (R. 629). Additionally, on September 22, 2009, more than two months after Dr. Jordan's evaluation stating that the claimant could only work two hours in a day, the claimant testified that after two weeks of physical therapy she was able to move and use her left arm with no pain. Thus, the evidence also supported a contrary finding to Dr. Jordan's July 15, 2009 opinion because other doctors and the claimant indicated that the claimant was not as limited as Dr. Jordan suggested.

Third, Dr. Jordan's opinion was inconsistent with his own medical records. Dr. Jordan's earlier evaluations of the claimant contradict his July 15, 2009 "Medical Statement Regarding Cancer for Social Security Disability Claim" because the earlier evaluations do not indicate any significant limitations on the claimant's physical abilities. For example, on July 13, 2009, two days before filling out the "Medical Statement Regarding Cancer for Social Security Disability Claim" form, Dr. Jordan stated that the claimant could move all extremities well and had equal strength in her extremities. At no point in the July 13, 2009 evaluation did Dr. Jordan mention the extensive limitations on the claimant's abilities that Dr. Jordan mentioned two days later in his "Medical Statement Regarding Cancer for Social Security Disability Claim." (R. 459; 403).

Because Dr. Jordan's July 15, 2009 report was contradicted by other doctors, the claimant, and even his own previous evaluations, the ALJ had good cause to give the report less than controlling weight.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is

supported by substantial evidence and is to be AFFIRMED.  A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 2nd day of July, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE